ORIGINAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

- 9 0 7 5 7

TRANSPORT WORKERS UNION OF
AMERICA, LOCAL 100, AFL-CIO;
ROGER TOUSSAINT, as President of
Transport Workers Union of America,
Local 100, AFL-CIO; TRANSPORT
WORKERS UNION OF AMERICA,
AFL-CIO; SONNY HALL, as President
of Transport Workers Union of
America, AFL-CIO; AMALGAMATED
TRANSIT UNION, LOCAL 726,
AFL-CIO; and ANGELO TANZI,
as President of Amalgamated Transit
Union, Local 726, AFL-CIO,

                    Plaintiffs,

    - against -

NEW YORK CITY TRANSIT
AUTHORITY and MANHATTAN AND
BRONX SURFACE TRANSIT
OPERATING AUTHORITY,

                   Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION AND ORDER**

**02 Civ. 7659 (SAS)**

FILED OPINION
U.S. DISTRICT COURT
SOUTHERN DISTRICT
OF NEW YORK
2004 OCT 12  A 9: 05

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

      This case requires the Court to find a balance between conflicting and

compelling interests. On one side of the scales is the interest of the New York

City Transit Authority, and the public at large, in the safe and efficient operation

1

MICROFILM
OCT 12 2004
~ 2 00 PM

of New York's public transport. On the other side are the protected privacy interests of tens of thousands of the Transit Authority's employees, represented here by the plaintiff unions.

The Americans with Disabilities Act of 1990 ("ADA") entitles employees (of covered institutions) to maintain a special zone of privacy from their employers concerning their health and medical conditions. Employers may not make inquiries regarding an employee's disabilities without a sufficient business justification. The Transit Authority has a longstanding practice of making certain general inquiries about its employees' medical conditions before approving their applications for sick leave. In this respect, the Transit Authority acts no differently from many other employers; and until recently, the conflict between these routine inquiries and the ADA was not widely recognized. The Second Circuit's recent decision in *Conroy v. New York State Department of Correctional Services*[1] held that even such routine and general inquiries might reveal disabilities, and thereby invade the privacy interests protected by the ADA. *Conroy* set out a framework to guide the district courts in determining whether such inquiries are, in a particular case, justified by the employer's business needs. This case appears to be the first in which a trial court must apply *Conroy's*

---

[1]    333 F.3d 88 (2d Cir. 2003).

2

analysis.

The plaintiff unions seek a declaratory judgment that the Transit Authority's policies and practices relating to employee sick leave ("the Policy") violate the prohibited medical inquiries and examinations provision of the ADA, and request an injunction prohibiting the Policy's enforcement. The Transit Authority advances two justifications for the Policy: *first,* curbing sick leave abuse, and, *second*, maintaining workplace and public safety. Although I recognize the importance of the public interests behind the Policy, I am bound to follow *Conroy*. Applying *Conroy*'s analysis, I find that the first justification is sufficient to support the inquiries only with respect to those employees with egregiously poor attendance records, and the second is sufficient only with respect to employees with safety-sensitive jobs. Further factual development will be required to determine which employees are performing such safety-sensitive duties.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as a controversy arising under federal law, and pursuant to 28 U.S.C. §1343(4), as an action to secure equitable relief under a federal civil rights statute. A bench trial was held from September 7, 2004 to September 14, 2004. The following constitutes the Court's findings of fact and conclusions of law.

# I. FINDINGS OF FACT

## A. The Parties[2]

Plaintiffs are three labor unions and their respective presidents:

Transport Workers Union of America, Local 100 ("Local 100"), and its president

Roger Toussaint; Local 100's parent union, the Transport Workers Union of

America ("T.W.U."), and its president Sonny Hall; and Amalgamated Transit

Union, Local 726 ("Local 726"), and its president Angelo Tanzi (collectively, "the

Unions"). Defendants are the New York City Transit Authority ("Transit

Authority") and its subsidiary, the Manhattan and Bronx Surface Transit

Operating Authority ("MABSTOA") (collectively, "the Authority"). The

Authority employs more than 47,000 people. Local 100 represents over 32,000 of

the Authority's employees, including subway station cleaners, bus operators and

other employees in Manhattan, the Bronx and Brooklyn. Local 726 represents

over 1,300 of the Authority's employees, including bus operators and maintenance

employees in Staten Island. Some of the employees represented by the Unions are

employed by the Transit Authority, and others by MABSTOA. The Unions and

the Authority are, and at all relevant times have been, parties to collective

---

[2]    The facts regarding the parties are taken from the Joint Pretrial Order
and the parties' Proposed Findings of Fact, and are undisputed.

bargaining agreements ("CBAs").  Local 100 and Local 726 each have separate

bargaining agreements with the Authority.

## B. The Sick Leave Policy

The inquiries challenged by the Unions are part of the sick leave

policy codified in the CBAs between the Authority and the Unions.[3]  The Policy

involves three inquiries.  *First*, any employee[4] who seeks sick leave must, before

missing work, call the Authority to give notice at least one hour prior to the start

of his or her scheduled tour of duty.  This notice must include a brief statement of

the nature of the illness or condition causing the absence.[5]

*Second,* on returning to work, the employee must submit a sick leave

application form (known colloquially as a "sick form").[6]  The employee must give

the completed sick form to his or her supervisor.  The sick form must be submitted

---

[3]    *See* December 18, 1997 Agreement Between the Transit Authority
and Local 726, Plaintiffs' Exhibit ("Pl. Ex.") 1-a at 42-47; July 1, 1994 Agreement
Between the Authority, T.W.U. and Local 100, Pl. Ex. 2-a at 42-47.

[4]    Here, and throughout this opinion, "employee" refers only to
employees represented by the Unions.

[5]    *See* Sick Leave Manual, Pl. Ex. 4 at 11, 28.

[6]    *See* Sick Leave Manual at 12.  *See also* Blank Application for Leave
of Absence Due to Illness, Pl. Ex. 3; Completed Applications for Leave of
Absence Due to Illness, Defendants' Exhibit ("Def. Ex.") I-1 through I-6.

5

by all employees after an absence of any length, regardless of whether the employee seeks paid or unpaid leave. The sick form requires the employee to state again the "nature of [the] disability" which caused him or her to be "unfit for work on account of illness during this period." The form must be submitted within three days of the employee's return from his or her absence.[7] During that time, the employee returns to normal duty.[8]

Third, in certain circumstances, employees are also required to have the "doctor's certification" section of the sick form completed. In such cases, the employee's doctor must certify that the employee's illness "so incapacitated the employee that he/she was incapable of performing his/her duties" during a specific period of time. The doctor must also state briefly the employee's "diagnosis/objective findings" and "treatment/prognosis and expected date of return."[9]

---

[7]  See Sick Leave Manual at 29.

[8]  See Trial Transcript ("Tr.") at 41 (Julio Rivera, Local 100 Vice President of Maintenance of Way), 449-50 (Edward Catenzaro, General Superintendent of Ulmer Park Depot). If the employee fails to hand in the form on time, there may be disciplinary consequences, but it is a "rare occurrence" for the employee to be held out of service pending receipt of the form. Id. at 449-50 (Catenzaro), 467-68, 475 (David Hyland, Transit Authority Senior Director of Labor Contract Disputes).

[9]  See Sick Leave Manual at 12-13, 29.

6

The Authority's employees are divided into several categories, established through collective bargaining, to determine when a doctor's certificate is required. Local 726-represented employees must submit a doctor's certificate after an absence of more than two days. Only thirty percent of Local 100-represented employees, those with the heaviest record of sick leave usage, are required to submit a doctor's certificate after an absence of more than two days. The remaining seventy percent are required to submit a doctor's certificate after an absence of more than three days.[10]

Finally, all employees who have been placed on a "sick leave control list" are required to submit a doctor's certificate after an absence of *any* length.[11] An employee is placed on the list after taking six absences without a doctor's certification in one year, or after a suspicious "pattern of usage."[12] A suspicious pattern of usage may mean consistent absence on the same day of the week or month, or adjacent to regular holidays or coincident with sports events, or similar suspicious conduct. It is not necessary that the employee have been proved to

---

[10]    *See* Tr. at 106 (Paul Hutchins, Transit Authority Senior Director of Labor Productivity).

[11]    *See* Sick Leave Manual at 13-15.

[12]    *Id.* at 15.

7

have abused sick leave, nor does such proof by itself place an employee on the list.[13]

      The Policy has existed in substantially its present form for decades. It was incorporated into the CBAs between the Unions and the Authority in 1982, by order of a special independent arbitration panel. It has remained in the CBAs, which have been periodically renegotiated and renewed, since that time.[14]

## C. The Purpose of the Policy's Disclosure Requirements

      The Authority has identified two main purposes served by the medical disclosures required by the Policy. *First*, the Authority asserts that the disclosures are used to detect and deter abuse of sick leave - - that is, employees taking sick leave when they are not in fact too sick to work. *Second*, the disclosures may alert the Authority to dangerous medical conditions in safety-sensitive employees such as bus operators.[15] I will first discuss the evidence offered in support of these concerns - - the high cost of absenteeism and the safety

---

[13]    *See id.*

[14]    *See* Tr. at 54-58 (Rivera), 78-79 (Angelo Tanzi, President of Local 726), 245-49 (Ralph Agritelley, Transit Authority Vice President of Labor Relations).

[15]    The Authority also argues that the Policy's disclosures serve other, less significant purposes. For example, they help the Authority to meet its obligations under the Family and Medical Leave Act of 1993.

risks associated with impaired bus operators. I will then address whether the evidence establishes that the sick forms are reviewed by the Authority's management in a way that effectively meets these concerns.

### 1. The Extent and Cost of Sick Leave Abuse

Employee absences impose substantial costs on the Authority and on the public. Aaron Stern, the Authority's Deputy Budget Director for Budget Control, testified that paid sick leave costs the Authority over $74 million annually.[16] This represents the total cost to the Authority of all paid sick leave, legitimate or illegitimate. This figure is based on "what would be the additional change in the number of positions that would be required to do the fixed amount of work if there were no paid sick leave . . . [T]he answer is 657 positions fewer would be required if there were no paid sick leave. And that would save $74.4 million."[17]

Stern's figure of $74 million does not include the costs of *unpaid* sick leave. However, this cost is also considerable. Although it is not clear from the record precisely how much unpaid sick leave is taken, it appears that the

_____

[16]    *See* Tr. at 150 (Stern). *See also* Cost of Paid Sick Leave, Ex. E-1. Plaintiffs do not contest the rough accuracy of this estimate.

[17]    Tr. at 150 (Stern).

Authority's employees take nearly as many days of unpaid sick leave as they do paid sick leave.[18]  Although the Authority does not have to pay wages to employees when they take unpaid sick leave, such leave is not without its costs. The Authority must pay for substitute workers, which may require overtime payments,[19] and must pay fringe benefits to both the replacement and the absent worker.[20]

Moreover, the Authority presented compelling evidence of substantial indirect costs of sick leave, whether paid or unpaid.  For instance, Marie Bernoth, a manager responsible for subway station night cleaning crews, testified that employee absences caused significant disruption to subway cleaning services. Frequently, the Authority is unable to replace absent cleaning employees.  This

---

[18]   For example, for station cleaners, the average total of unpaid sick leave for the period May 2003 to April 2004 was 11.020 days, while the average total of paid sick leave was 11.490 days. *See* Chart of Average Sick Leave Usage, Station Cleaners, Def. Ex. G-10. *See also* Chart of Average Sick Leave Taken, Bus Operators, 2002-2004, Def. Ex. E-5 (showing that, in the first quarter of 2004, bus operators took an average of 1.89 paid sick days and 1.74 unpaid sick days). Bus operators and station cleaners alone took 75,000 days of unpaid sick leave in 2003. *See* Tr. at 515 (Jorgen Cleeman, Paralegal for Gladstein, Reif & Meginniss, counsel to the Unions) (stipulation).

[19]   *See* Tr. at 121-22 (Hutchins).

[20]   *See id.* at 165 (Stern).  Annually, these fringe benefits amount to an average of $8,517 employee. *See* Cost of Paid Sick Leave, Def. Ex. E-1.

10

may result in stations going uncleaned, leading to unsanitary conditions.[21] Even

when the Authority is able to make replacements, employee efficiency and morale

is decreased as they are placed in unfamiliar stations, and required to work in

unfamiliar teams.[22] Bus service may also be disrupted and delayed as a result of

absenteeism.[23] Sick leave (both paid and unpaid) thus affects important services,

imposing costs on the public as well as on the Authority.

The percentage of sick leave that is illegitimate is not clear - - and

perhaps could never be measured with precision - - but the Authority has

presented evidence that it is significant.  The clearest evidence of abuse, of course,

is the fact that every year the Authority denies three to four thousand days of sick

leave, on grounds of abuse.[24]  This is, however, a relatively small percentage of the

total number of sick leave applications:  in 2003, the Authority's employees took a

total of roughly 280,000 paid sick days.[25]  The number of sick leave applications

---

[21]    *See* Tr. at 231-34 (Bernoth).

[22]    *See id.* at 240 (Bernoth).

[23]    *See id.* at 418 (Catenzaro).

[24]    *See id.* at 205-07 (Robert Finnegan, Transit Authority Labor Cost
Control Unit).  Some percentage of sick leave denials and related disciplinary
actions are vacated on appeal.  The precise percentage is not clear, but is
apparently small.  *See id.* at 476-77 (Hyland).

[25]    *See* Cost of Paid Sick Leave, Def. Ex. E-1.

that are denied amounts to 1-2% of the total of paid sick leave. Plainly, this quantity of claimed sick leave is abusive: given the difficulties of detection, the real amount is likely to be larger.

The Authority has presented anecdotal evidence intended to show that the real amount of sick leave abuse is much more substantial than the amount that is actually denied. The Authority's witnesses testified that sick leave usage rises on certain days. For example, sick leave usage is said to be higher than usual when the weather is especially bad, or especially good, and on the days of major sporting events. Sick leave also rises around regular holidays, suggesting that employees are using sick leave to extend their vacations.[26] I find this testimony, coming from witnesses with long experience both as employees of the Authority and as managers, to be credible. The evidence shows that there is a significant level of sick leave abuse.

However, the Authority has *not* proved that the abuse is so widespread that overwhelming numbers of employees are abusing the leave policy. The evidence of suspicious patterns of usage is anecdotal and impressionistic: while it shows significant and troubling levels of abuse, it is not clear how common such abuse is. The Authority has also offered a great deal of

---

[26]     *See* Tr. at 239 (Bernoth), 416-18 (Catenzaro).

12

statistical evidence intended to show that sick leave abuse has reached such epidemic levels that it may be considered the norm among the Authority's employees. This evidence is not convincing.

For instance, the Authority offered evidence that usage of paid sick leave by MABSTOA employees was greater in 2004 than in 2003, following an increase in the amount of authorized paid sick leave.[27] The Authority asks the Court to infer that the explanation for this increase is that employees took advantage of the increase in paid sick leave to take leave when they could have worked. For several reasons, this inference is unwarranted.

*First,* while it is true that the usage of *paid* sick leave increased in 2004, usage of *unpaid* sick leave declined at the same time, so that the increase in total sick leave, while real, is less striking than the increase in paid sick leave taken on its own.[28] *Second,* this increase in sick leave usage could also support an inference that, before the increase in paid sick leave, employees were prone to

---

[27]    *See* Chart of MABSTOA Sick Leave Usage, Def. Ex. E-4. The average number of paid sick days taken by MABSTOA employees was 0.697 in the first quarter of 2003, and 1.247 in the first quarter of 2004. *See id.* The number of paid sick days available to these employees increased from five to twelve in September 2003. *See* Tr. at 171 (Stern).

[28]    *See* Chart of MABSTOA Sick Leave Usage, 2002-2004. Total sick leave, paid and unpaid, increased from 2.710 days per employee in the first quarter of 2003 to 3.048 days in the first quarter of 2004. *See id.*

work when they were in fact too sick to do so, to avoid losing income. *Third,* the Authority's own figures indicate that employees who did not receive an increase in paid sick leave also increased their sick leave during the same period by a similar amount.[29] *Fourth,* the Authority has not presented any evidence that the increase from 2002 to 2003 is more than the normal fluctuation between years, which could be caused by any number of factors (*e.g.,* a bad flu year).[30]

The Authority also points to the fact that sick leave usage is greater in May, the month in which employees' sick leave 'banks' are replenished, than in other months.[31] The Authority argues that this demonstrates that employees are taking advantage of the replenished stock of sick leave by taking leave when they are not ill. However, it is equally likely that sick employees are taking paid sick leave in May, while in the later months of this cycle, they either take unpaid leave

---

[29]     *See* Tr. at 187-89 (Stern); Chart of Average Sick Leave Taken, Bus Operators, 2002-2004, Def. Ex. E-5.

[30]     Notably, the Authority has failed to compare 2002 and 2003 with any other years (other than the first quarter of 2004).  Without some evidence of the normal fluctuation between years, it is hard to know what weight to give the figures offered by the Authority.

[31]     *See* Tr. at 179 (Stern); Chart of Average Sick Leave Taken by Station Cleaners by Month in 2002, Def. Ex. G-7; Chart of Average Sick Leave Taken by Transit Authority Bus Operators by Month in 2002, Def. Ex. G-8; Chart of Average Sick Leave Taken by MABSTOA Bus Operators by Month in 2002, Def. Ex. G-9.

14

or worked despite their illness, having depleted their banks of paid sick leave.

For the foregoing reasons, I find that there is a significant level of sick leave abuse at the Authority. However, the evidence is not sufficient to show that such abuse is so widespread as to be the norm among the Authority's employees.[32]

## 2. Workplace and Public Safety Concerns

At trial, the Authority focused on bus operators as an example of a safety-sensitive class of employees. The danger that may be posed by a bus driver who is unfit for duty due to illness or medication is obvious - - a single accident could injure many people.[33] The law recognizes the importance of these

---

[32]    Agritelly, the Vice President for Labor Relations, testified that, in 2002, Marc Kagan, then Assistant to the President of Local 100, told him that "employees had the right to use 12 days a year [of paid sick leave] whether they were sick or not." Tr. at 257 (Agritelly). The Authority argues that this demonstrates that sick leave abuse is widespread. This is incontrovertibly the statement of the Union's agent, and concerns a matter within the scope of Kagan's employment. *See* August 12, 2002 Letter from Kagan to Agritelly Entitled "Re: Sick Leave Policy," Def. Ex. A. It is therefore admissible as an admission of a party-opponent under Federal Rule of Evidence 801(d)(2). *See Pappas v. Middle Earth Condominium Ass'n,* 963 F.2d 534 (2d Cir. 1992). However, Kagan's statement at most indicates that some Union officials (*e.g.,* Kagan) have a lax attitude towards sick leave abuse by their members; it says nothing about the extent to which their members do in fact abuse sick leave.

[33]    For example, in 1995 an Authority bus operator who had a "history of alcoholism in which he had withdrawal seizures and blackouts [and] was very

15

concerns.[34]  The Authority is under a legal obligation not to "permit a driver to operate a bus while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness or any other cause, as to make it unsafe for him to begin or continue to operate the bus."[35]  The Authority is also required to prohibit drivers from operating a bus within six hours of having consumed a drug or intoxicating liquor, including certain common medications such as Nyquil.[36]

Pursuant to a pre-trial agreement, no evidence was presented as to the safety-sensitive nature of other jobs.  It is likely that some other classes of employees - - such as tower operators, or certain maintenance employees - - raise similar safety concerns, while others do not.

---

debilitated from . . . esophageal cancer" lost consciousness behind the wheel and killed one person, injured another and caused considerable property damage.  Tr. at 342-43 (Alexander).

[34]     *See, e.g., Siederbaum v. City of New York,* 309 F. Supp. 2d 618 (S.D.N.Y. 2004) (holding that the Authority was justified in refusing to permit a victim of bipolar disorder to be a bus operator, because of the substantial risks posed by the condition).  *See also Burton v. Metro Transport Authority,* 244 F. Supp. 2d 252, 262 (S.D.N.Y. 2003) ("[I]t is self-evident that the bus operator position is extremely safety-sensitive . . . . The Court need not cite to the record to observe that there is probably no more challenging place to drive a bus - - without injury to self or others - - than New York City.").

[35]     New York Vehicle and Traffic Law § 509-k (McKinney 1996).

[36]     *See id.* § 509-l.

16

### 3. The Procedures for Review of Sick Forms and Medical Diagnoses

#### a. Review for Purposes of Detecting Sick Leave Abuse

An employee's sick form is reviewed, in the first instance, by his or her supervisor.[37] The Authority's Sick Leave Manual instructs supervisors to look for irregularities in the form, such as signs of forgery of the doctor's certificate, or discrepancies between the dates on which the doctor certifies that the employee was ill and the period of absence actually taken.[38] Supervisors are also instructed to determine whether the length of absence appears reasonable in light of the diagnosis and treatment described.[39] They may also examine whether the employee's self-diagnosis matches that of the doctor.[40] Suspicious forms are submitted to the Labor Cost Control Unit in the Labor Relations Department for further investigation, which may involve review of the stated diagnosis by the Authority's medical professionals. [41] Only a "small percentage" of sick forms are

---

[37]    *See* Sick Leave Manual at 13; Tr. at 218-20 (Charles McKenna, Transit Authority Director of Employee Policy Compliance), 424, 443 (Catenzaro).

[38]    *See* Sick Leave Manual at 13-14.

[39]    *See id.*

[40]    *See id.*

[41]    *See id.*; Tr. at 195-96 (Finnegan).

17

referred for investigation on suspicion of abuse.[42]   Nevertheless, the Authority denies three to four thousand days of sick leave a year on grounds of abuse.[43] Every year, the Authority initiates thousands of disciplinary actions for sick leave abuse.[44] In addition, the Authority regularly pursues doctors who have provided fraudulent certificates, recouping money from them and in some cases causing them to lose their licenses.[45]

Although thousands of sick forms are referred every year for further review, denial or disciplinary action, only a small number of these are questioned because of irregularities in the medical disclosures challenged by the Unions.  In the majority of cases, if a form is questioned, it is because of other irregularities. Nonetheless, a significant quantum of abuse is detected as a result of the medical disclosures:  one witness estimated that 8-10% of those forms that are sent for further review are questioned because of the medical disclosures, rather than other irregularities.[46]

---

[42]    Tr. at 444 (Catenzaro).

[43]    *See id.* at 207 (Finnegan).

[44]    *See id.* at 471 (Hyland).

[45]    *See id.* at 117 (Hutchins).

[46]    *See id.* at 218-23 (McKenna).  Another witness testified that, even though the majority of fraud is simple forgery of the dates covered by the doctor's

While the Authority has adduced evidence that the Policy results in the denial of some sick leave and related disciplinary actions, the statistics cannot show that the Policy *deters* abuse.[47] This absence of evidence is not surprising. The Policy has been in place essentially unchanged for decades, and the Authority therefore has had no opportunity to observe levels of sick leave abuse in the Policy's absence. Despite this understandable gap in the Authority's statistical presentation, it strains credulity to believe that the Authority's investigations and disciplinary actions, including suspensions and dismissals, have no deterrent

---

certificate, the diagnosis may alert reviewers to that forgery - - as when an employee alters a form to claim ten days instead of just one for a common cold. *See id.* at 212 (Finnegan).

[47]    For example, in an attempt to prove that the Policy's medical certification requirements have a deterrent effect, the Authority points to an increase in sick leave applications among Local 100 employees in 2003, following a relaxation in medical certification requirements. On May 1, 2003, the Policy with respect to Local 100 employees was modified to give the seventy per cent of employees with the lightest sick leave records an extra day of leave before requiring a doctor's certificate. *See id.* at 106 (Hutchins), 180 (Stern). Sick leave usage among the affected employees was almost eight per cent higher in the twelve months following May 1, 2003 than in the preceding twelve months. *See* Chart of Average Sick Leave Usage, Station Cleaners, 2002-2004, Def. Ex. G-10. The Authority has not proven its point. The increase in sick leave in 2003 may show only that, before the relaxation in certification requirements, employees who were genuinely ill preferred going to work to obtaining a doctor's certificate. Moreover, there was a similar increase in sick leave usage in 2003 among employees to whom this relaxation did not apply, suggesting that the increase may have been due to other causes. *See* Tr. 186-89 (Stern); Chart of Average Sick Leave Taken, Bus Operators, 2002-2004, Def. Ex. E-5.

19

effect. I therefore find that the Policy has some deterrent effect, albeit one that is unquantified and possibly unquantifiable.

### b. Review for the Purpose of Detecting Dangerous Medical Conditions

The sick forms are also reviewed for evidence of medical conditions affecting fitness to work. When reviewing bus operators' sick forms, supervisors are instructed to contact the Authority's medical professionals, at a Medical Assessment Center ("M.A.C."), if a form raises questions about the employee's fitness.[48] Employees whose medical conditions render them unfit to work may be kept off duty.

The procedure for review for fitness is somewhat informal and haphazard. Supervisors are given no formal training in detecting dangerous conditions, nor a list of particular conditions to look for. Catenzaro described the process as a matter of informal exchange of experience: "[w]orking the depot, employees learn through their supervisors. We teach them . . . It is informal-type training. It occurs within the depot."[49] Inexperienced supervisors are instructed to "error [sic] on the side of safety" and refer all questionable medications or

---

[48]    *See* Tr. at 428-33 (Catenzaro). *See also* Sick Leave Manual at 14.

[49]    Tr. at 428-29 (Catenzaro).

20

conditions to experienced managers or to the M.A.C.[50]

Nonetheless, it is clear that sick forms are reviewed for safety purposes with some regularity. Catenzaro testified that "forms get brought to us on a fairly regular basis if there is a question."[51] Catenzaro further testified that around 50-100 forms per year, of the hundreds or thousands he sees at his depot each year, "raise a flag" and are sent on for further investigation.[52] Dr. Michelle Alexander, the Authority's assistant vice president of occupational health services, testified that supervisors at the depot call doctors at the M.A.C. with questions about medication "daily."[53] I find both Catenzaro's and Alexander's testimony credible.

Alexander also testified as to why the Authority carries out its own review of the diagnoses, rather than rely on a doctor's certification of an employee as fit to work:

> Most private doctors are totally unaware of the standards and the actual requirements that most of our employees do . . . . I have been working for the Transit Authority for many years and I am constantly amazed at what the private doctor will say the employee

---

[50]    Id. at 430 (Catenzaro).

[51]    Id. at 433 (Catenzaro).

[52]    Id. at 445 (Catenzaro).

[53]    Id. at 316 (Alexander).

can do and return to work doing because they don't understand what the employee really does.[54]

This testimony is undoubtedly credible.

### D. The Authority's Other Inquiries

The Authority makes a number of other health-related inquiries, mostly for the purpose of detecting dangerous medical conditions, which the Unions do not challenge. Bus operators who have been out sick for more than twenty-one consecutive days are required to take a medical exam to determine their fitness before returning to work.[55] In addition, bus operators are subject to random drug testing[56] and are required to report their drug and medication usage to the Authority.[57] Bus operators are also required to take a physical exam at least biannually.[58] Employees who work in confined spaces or with hazardous

---

[54]    *Id.* at 338-39 (Alexander).

[55]    *See id.* at 370-71 (Alexander).

[56]    *See id.* at 374-75 (Alexander).

[57]    *See id.* at 398-99 (Stephen Vidal, Transit Authority Chief Officer for the Department of Buses, Safety and Training Division).

[58]    *See id.* at 373 (Alexander). Bus operators over fifty are required to take this exam annually. *See id.* at 89 (Tanzi). Bus operators with certain medical conditions may be examined more often: for example, diabetic employees are examined at least every six months, or more frequently, depending on the severity of the condition. *See id.* at 373 (Alexander).

22

chemicals are required to have more frequent physical examinations.[59]  On a more

informal basis, dispatchers are required to give bus operators a "non-medical look-

over" before allowing them to go on duty.[60]  Finally, "employees may be ordered

to submit to a medical examination at the direction of the medical director,

department head or a member of management at any time if, in his/her opinion,

one is necessary."[61]  In addition, the Authority investigates sick leave abuse by

means other than review of the sick form:  for example, the Authority may call the

absent employee's house, or conduct surprise home investigations.[62]

## II.  APPLICABLE LAW

The Unions argue that the Policy violates the ADA, which prohibits

covered employers from making inquiries of their employees that may tend to

reveal a disability.[63]  The relevant section of the ADA provides that:

---

[59]    See id. at 385-86 (Alexander).

[60]    Id. at 458 (Catenzaro) ("We look to see if the operator appears to be
disheveled, are their eyes glassy, are their eyes bloodshot . . . things of that type.").

[61]    Sick Leave Manual at 14.

[62]    See id. at 11-12.

[63]    The Unions bring this suit under Title I of the ADA, which prohibits
employment discrimination by any covered entity, and Title II of the ADA, which
prohibits discrimination on account of disability by any public entity.

23

A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.[64]

My analysis of this law must follow the framework set out in the Second Circuit's recent opinion in *Conroy,* in which the court addressed a policy very similar to the one at issue here. The employer in *Conroy* required employees returning from sick leave to produce a "general diagnosis" and medical certification.[65] The *Conroy* court held that the general diagnosis requirement was an inquiry within the meaning of the ADA prohibition, because it "may tend to reveal a disability."[66]

Such an inquiry is lawful only if it is shown to be "job-related and

---

[64]    42 U.S.C. § 12112(d)(4)(A) (the "ADA prohibition"). While the Unions sue under both Title I and Title II of the ADA, the substance of their claim relies on this provision found solely in Title I. *See also* 28 C.F.R. § 35.140(b)(1) (adopting, under Title II, all the requirements of Title I, with respect to entities subject to Title I).

[65]    *Conroy,* 333 F.3d at 91.

[66]    *Id.* at 95. *See also Roe v. Cheyenne Mountain Conference Resort,* 920 F. Supp. 1153, 1154-55 (D. Colo. 1996) (holding that requiring employees to disclose which prescription drugs they use is a prohibited inquiry because it may reveal disabilities or perceived disabilities).

consistent with business necessity."[67] This is an affirmative defense as to which the employer has the burden of proof. The employer is required to make a two-part showing.

*First,* the employer must "show that the asserted business necessity is vital to the business."[68] The employer must "show more than that its inquiry is consistent with mere expediency [or that] an inquiry is convenient or beneficial to its business."[69] *Conroy* recognized that "business necessities may include ensuring that the workplace is safe and cutting down on egregious absenteeism."[70] However, an employer "cannot merely rely on reasons that have been found valid in other cases," but must show that the necessity is vital on the facts of the particular case.[71] What constitutes a business necessity may vary from workplace

---

[67]   42 U.S.C. § 12112(d)(4)(A). The Authority argues that its inquiries may also be justified by another provision of the ADA, 42 U.S.C. § 12112(d)(4)(B), which makes "acceptable" an employer's "inquiries into the ability of an employee to perform job-related functions." The same argument was squarely rejected in *Conroy,* which held that a general diagnosis "is not a narrowly tailored inquiry into the employee's ability to carry out her job-related functions," and is therefore not covered by that provision. *Conroy,* 333 F.3d at 94.

[68]   *Conroy,* 333 F.3d at 98.

[69]   *Id.*

[70]   *Id.*

[71]   *Id.* at 101.

25

to workplace.[72]

*Second,*

> [t]he employer must also show that the examination or inquiry genuinely serves the asserted business necessity and that the request is no broader or more intrusive than necessary. The employer need not show that the examination or inquiry is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving the employer's goal.[73]

Moreover, if the employer's inquiries are part of a general policy affecting broad classes of employees, then "[i]n defining a class subject to a general policy, the employer must show that it has reasons consistent with business necessity for defining the class in the way that it has."[74] The employer need not make a particularized showing that the inquiry is justified with respect to each individual employee. However, the employer must show that the policy is generally justified with respect to the class affected.[75] The court should grant some deference to the employer in determining how to define a class subject to a

---

[72]   *See id.* at 99.

[73]   *Id.* at 98. The Authority argues that the correct reading of the statutory language is that "consistent with business necessity" requires only that the inquiry does not actually conflict with or undercut the stated policy. Whatever the merits of this gloss on the statute, it is clearly contradicted by *Conroy.*

[74]   *Id.* at 101.

[75]   *See id.*

26

general policy.[76]

For example, *Conroy* discussed a policy applicable to employees who had been identified as probable sick leave abusers. *Conroy* held that this policy was probably justifiable, if the class affected was genuinely focused on a small group of consistent attendance abusers.[77] "Nonetheless, if the policy ultimately affects a class of so-called attendance abusers that is much larger than that small group of employees with truly egregious attendance records . . . [the employer] will find it more difficult to prove business necessity."[78]

## III. CONCLUSIONS OF LAW

### A. Are the Policy's Disclosures Within the Scope of the ADA Prohibition?

As a threshold matter, the Authority argues that the Policy is not an "inquiry" within the meaning of the ADA prohibition. *Conroy* clearly forecloses this argument. The inquiries here are almost identical to those in *Conroy*. Like those inquiries, the inquiries made by the Authority "may tend" to reveal disabilities or perceived disabilities.[79] They are therefore covered by the ADA

---

[76]    *See id.*

[77]    *See id.* at 102.

[78]    *Id.* (quotation omitted).

[79]    *Id.* at 95.

27

prohibition, and the Authority must show that they are job-related and consistent with business necessity.

## B. Is the Policy Job-Related and Consistent With Business Necessity?

The Authority claims that the Policy is justified by two business necessities: curbing sick leave abuse, and ensuring safety. With respect to each justification, the Authority must show (1) that the claimed purpose is in fact a business necessity, (2) that the Policy genuinely contributes to it, and (3) that the class affected is reasonably defined. For the following reasons, I find that the asserted business necessity of curbing sick leave abuse is not sufficient to justify the Policy other than with respect to the class of employees on the sick leave control list. The asserted business necessity of ensuring safety is sufficient to justify the Policy with respect to bus operators, and any other group of employees who perform safety-sensitive work.[80]

### 1. Sick Leave Abuse

#### a. Is Curbing Sick Leave Abuse a Business Necessity?

*Conroy* recognized that curbing absenteeism may be a business necessity, in some workplaces, but held that the employer has the burden of

---

[80] As noted, pursuant to a pre-trial agreement, no evidence was presented as to the safety-sensitive nature of other jobs; a second trial will be required to determine this issue.

showing that this goal is a business necessity on the facts of each particular case. The Authority has met this burden: it is vital to the Authority's business that it control sick leave abuse. Sick leave imposes enormous costs on the Authority, and on the public at large, draining public funds and disrupting vital services. The Authority has demonstrated that some significant percentage of these costs results from abuse of sick leave. Though the precise quantum of abuse is unclear, the cost to the Authority and the public of *any* degree of abuse is significant.

The Authority is required by New York law to operate for the "convenience and safety of the public on a basis which will enable the operations thereof, exclusive of capital costs, to be self-sustaining."[81] Sick leave abuse frustrates the Authority's obligations, under the law and to the public, to provide convenient and safe service on a self-sustaining basis. I therefore find that curbing sick leave abuse is a legitimate business necessity for the Authority.

### b. Does the Policy Genuinely Serve the Stated Purpose?

The evidence shows that the medical diagnoses contained within the Policy serve the purpose of curbing sick leave abuse. Most obviously, the medical diagnoses result in the denial of a significant number of applications for sick

---

[81]    Public Authorities Law, §1202(1) (McKinney 2004).

29

leave.  Every year, the Authority denies thousands of applications for sick leave,[82] and issues thousands of disciplinary action notices against employees for abuse of the sick leave policy.[83]  Many of these denials of sick leave and disciplinary actions arise out of irregularities in the medical diagnoses.  If the Authority could not obtain a general diagnosis, its ability to detect abuse would be significantly reduced.  In addition, the Authority has used the information contained in the medical diagnoses to detect doctors selling fraudulent sick leave excuses, putting some of them out of business and recouping tens of thousands of dollars.  Even if the Court were to assume - - quite implausibly - - that the Authority's disciplinary actions and investigations do nothing to deter additional fraudulent claims by employees, or fraudulent diagnoses by doctors, it would still be clear that the medical diagnosis requirement serves the Authority's legitimate business purposes.  The diagnosis requirement reduces the costs associated with sick leave abuse by making it possible for the Authority to deny fraudulent sick leave, saving significant sums of money.  Because I also find that the diagnosis requirement has some, albeit unquantifiable, deterrent effect, there can be no question that the diagnosis requirement genuinely serves the purpose of curbing sick leave abuse.

---

[82]   *See* Tr. at 207 (Finnegan).

[83]   *See* Tr. at 471 (Hyland).

30

It may be true, as the Unions argue, that the contribution of the diagnosis requirement to this purpose is small, when compared to those aspects of the Policy that they are not challenging.[84]  However, *Conroy* does not require that the challenged inquiry be "the only way of achieving a business necessity," only that it "genuinely serves" the purpose in a "reasonably effective" manner.[85]  The Authority has met this test.

### c. Is the Class Affected Reasonably Defined?

Different aspects of the Policy affect different classes of employees. The first inquiry, the requirement that employees call in to give notice, and the second inquiry, the requirement that employees give a self-diagnosis on their sick forms, affect all employees taking any amount of sick leave.  The third inquiry, the requirement of a doctor's certificate, affects various classes differently, but ultimately affects all employees taking three or more days of sick leave. Employees on the sick leave control list must submit a doctor's certificate after an absence of any length.  The class of employees affected by at least some aspect of

---

[84]    For instance, plaintiffs do not challenge the requirement that a doctor certify that the employee was unfit to work during the dates of absence.  Even without a diagnosis, such a requirement would prevent many cases of abuse.  The Authority also has other, unchallenged means of investigating sick leave abuse, such as surprise home investigations.

[85]    *Conroy*, 333 F.3d at 98.

31

the Policy is thus very broad. *Conroy* held that an employer seeking to justify a general policy aimed at such a broad group would have a "more difficult" burden than an employer whose policy affected a narrower, more carefully drawn group.[86]

*Conroy* requires the Court to grant the Authority some deference in defining the class subject to the Policy.[87] But even when all due deference is accorded to the Authority, it has not met its burden of showing a reasonable basis for making inquiries of all employees taking any amount of sick leave, or even of all employees taking three or more days of sick leave. The Authority has not shown that it has any reasonable basis to suspect that such broad swathes of its employees are sick leave abusers. Only a small percentage of sick leave has been clearly shown to be abusive. While that quantity of abuse imposes significant costs, and the Authority is justified in enacting a narrowly drawn policy to combat it, there has been no showing that abuse is so widespread as to justify the virtually universal sweep of the current Policy. Moreover, the Authority is fully capable of identifying those employees who *do* have truly egregious attendance records, and in fact already maintains a control list of such employees. The asserted business necessity of curbing sick leave abuse therefore cannot justify the Policy as it

---

[86]    *Id.* at 102.

[87]    *See id.* at 101.

32

currently stands.

As to the class of employees on the sick leave control list who take any amount of sick leave, I find that the Policy is justified. The sick leave control list is a narrowly drawn class. Although the list undoubtedly includes some innocent employees, the Authority has reasonable grounds for suspecting that employees on the list are potential attendance abusers.[88]

## 2. Workplace and Public Safety Concerns

### a. Is Safety a Genuine Business Necessity?

Pursuant to a pre-trial agreement, the Authority made its case that maintaining public safety was a business necessity with reference only to bus operators. The record shows clearly that it is a business necessity for the Authority to ensure that bus operators are fit to perform their duties. The danger that may be posed by an unfit bus operator is obvious and undisputed.

---

[88]    *Conroy* also questioned the amount of discretion given to management in drawing up such a list, fearing that "such a flexible policy . . . could be used to target individuals with actual or perceived disabilities." *Id.* at 102. The criteria for the Authority's control list do have a degree of flexibility. In particular, the criteria for "pattern absences" are somewhat loosely defined and give supervisors some discretion. However, this discretion is reasonably contained by the definitions and statements of purpose contained in the Sick Leave Policy Manual, and by the fact that an employee must maintain a consistent pattern of absences to get on the list. Nothing in the record suggests that the control list policy has in fact been enforced in a discriminatory or inconsistent manner.

### b. Does the Policy Genuinely Serve the Stated Purpose?

The Unions argue that the Policy does not in fact serve the purpose of maintaining safety. The Unions point first to the fact that employees are given three days from their return to work to submit their sick forms, during which time they are permitted to resume their work duties. This clearly limits the ability of the Policy to detect dangerous conditions in a timely manner. This limitation is mitigated to some extent, however, by the requirement that employees call in with a statement of their condition before taking leave, and by the fact that many employees choose to submit their sick forms before the three-day period elapses.

The Unions also make much of the fact that the diagnoses are not reviewed in the first instance by personnel with any training in detecting dangerous conditions or medications. The informal, rule-of-thumb character of the first stage of review of sick forms is certainly troubling. This concern may be partly alleviated by the fact that supervisors are instructed to err on the side of caution and to refer any medication or condition they do not recognize to medical reviewers or to their experienced superiors.

Finally, the Unions contrast the Policy with other inquiries made by the Authority - - for example, the requirement that bus operators out sick for more than twenty-one days take a physical exam, or the requirement that all bus

34

operators take a biannual physical exam - - which the Unions concede to be

reasonably effective methods of ensuring that employees are fit to work. The

Unions argue that in light of these other, more effective inquiries, the challenged

Policy is neither necessary nor productive. The Unions also argue that the

Authority could achieve its purposes by requiring an employee's doctor to confirm

his fitness to work, without disclosing his condition.

Despite the limitations of the Policy, and the possibility of alternative

approaches to the problem, I find that the Authority has met its burden of showing

that the Policy is reasonably effective in maintaining safety. The Policy is clearly

not optimally effective, but *Conroy* requires no more than that it "genuinely

serves" its stated purpose in a "reasonably effective" manner.[89] The criticisms that

the Unions level at the Policy might also be made of the inquiries they do not

challenge, or indeed of any reasonably cost-effective inquiry that could be

imposed. The bus operators' biannual physical, for example, could be conducted

too infrequently to effectively detect dangerous conditions. Each of these

inquiries, however, contributes in some way to the purpose of detecting dangerous

conditions, with each inquiry acting as a backstop to the others.

Nor am I persuaded that the Authority could reliably achieve its

---

[89]    *Conroy*, 333 F.3d at 98.

purposes by asking an employee's doctor to certify him fit for work.  Doctors may

underestimate the requirements of a bus operator's job.  A few, the record shows,

are negligent, or more interested in their patient than in the Authority;  some are

simply for sale.  The Authority is under a heavy obligation to keep unfit drivers off

the city's streets:  it should not have to trust the judgment or scruples of its

employees' doctors to achieve this purpose.  The potential risks in this case are

severe indeed.  If the Policy makes even a small contribution to reducing the risks

posed by unfit drivers, it is amply justified.

### c.  Is the Affected Class Reasonably Defined?

The Authority has presented evidence that it has a reasonable basis

for concluding that bus operators who require sick leave pose a genuine safety

risk.  This is true even of bus operators who take only one day of sick leave; even

a brief, minor illness may render a driver unsafe behind the wheel (*e.g.,* a driver

who has taken certain ordinary, nonprescription cold remedies).

For the foregoing reasons, the Policy is justified with respect to the

class of bus operators.  The Authority may continue to enforce the Policy as it

stands with respect to that class.  Pursuant to the pre-trial agreement, the Authority

has presented no evidence on the safety risks associated with employees other than

bus operators.  As a result, I cannot make a decision as to whether safety

36

considerations might justify the application of the Policy to other groups.[90]  A

second trial will be needed to determine which other groups might also pose safety

risks.

### C.  The Scope of Permissible Inquiries[91]

The Authority may therefore apply the Policy as it stands to those

employees who meet the criteria of the sick leave control list, and to employees

with safety-sensitive roles, including bus operators.  With respect to employees

not on the control list and not in safety-sensitive positions, the Authority may

---

[90]    The Authority presented station cleaners as an example of employees who do not pose a risk to public safety.  The Court notes, however, that if station cleaning is delayed or disrupted due to sick leave abuse, the public's health and safety may well be endangered by unsanitary conditions.  The Authority has yet to make this case.  Even if it is shown to be true, however, the Authority would have no basis for applying the Policy to *all* station cleaners, rather than to a narrowly-drawn class of station cleaners who are reasonably suspected of sick leave abuse.  The Authority is justified in applying the Policy to *any* bus operator who takes *any* amount of sick leave, because if a driver is sick behind the wheel on even a single occasion, he may cause enormous damage.  Station cleaners, however, are not safety-sensitive in the same way.  Although the cumulative effect of illegitimate absences among station cleaners may pose health risks, no serious risk is posed (on the evidence so far presented to the Court) by a station cleaner coming to work in an unfit condition.

[91]    This ruling addresses only the inquiries in connection with sick leave challenged by the Unions.  These inquiries are the requirement that an employee call in before taking leave, the requirement that an employee fill in a sick form on returning to work, and the requirement of a doctor's certificate.  *See supra* Part I.B.  Nothing in this ruling should be taken to affect any other inquiries made by the Authority.  *See supra* Part I.D.

make the following inquiries, which do not have the potential to reveal disabilities and so do not run afoul of the ADA. The Authority may require an employee to call in advance of an absence, but may not require the employee to describe the nature of his illness. The Authority may require an employee to submit a sick form on his return, in which the employee must state that he was unfit to work due to illness during the period of absence, but may not ask the employee to state the nature of his disability. The Authority may also require an employee to submit a doctor's certificate for absences of certain lengths, as determined through collective bargaining. The Authority may require that the doctor certify that the employee was incapable, due to illness, of performing his duties during a specific period, and that the employee is now fit to resume his duties, but may not require the doctor to describe the nature of the illness or treatment.

### D. The Authority's Unclean Hands/Laches Defenses

The Authority also argues that the Unions' claims are barred on grounds of unclean hands or laches. The Authority argues that the Unions could have challenged the Policy at any time after the enactment of the ADA in 1992. During that time, the CBAs have been renegotiated numerous times, and the Unions have not negotiated for the removal of the Policy, or gone to impasse over it. The Authority argues that the Unions have therefore had the benefit of bargains

38

negotiated on the understanding that the Policy would remain in place, and are

estopped from challenging it now.

I have already rejected the Authority's argument that the Unions had

waived their standing to challenge the Policy by this conduct:

> The nature of collective bargaining is that it is a negotiation — one party relinquishes something (either by lowering its demands or agreeing to a provision that the other party values) in order to receive a concession that it deems more worthwhile. Therefore, in order to eliminate the sick leave policy from the collective bargaining agreement, the Unions would have been required to sacrifice some other benefit for their members. But if the policy is not legal, the Unions should not have to make that sacrifice. This is especially true where, as here, the challenged policy was inserted unilaterally by the Authority into the original collective bargaining agreement. Thus, the Unions would have been required to bargain to remove a pre-existing policy that the Authority valued; the cost of winning that concession would likely have been considerable.[92]

This reasoning still applies, whether the Authority characterizes this

argument as a challenge to standing or a defense of unclean hands. The Unions

were perfectly entitled to act as they did: they were not required to make

sacrifices, whether through negotiation or impasse, in order to remove an illegal

---

[92]     *Transport Workers Union of America, Local 100, AFL-CIO v. New York City Transit Auth.*, No. 02 Civ. 7659, 2004 WL 830289 at *5 (S.D.N.Y. Apr. 13, 2004) (citing *Thompson v. Board of Ed. of Romeo Community Schools,* 71 F.R.D. 398, 406 (W.D. Mich. 1976), *rev'd on other grounds*, 709 F.2d 1200 (6th Cir. 1983)).

provision from the bargaining contract.  Because there has been no showing of any

bad faith, fraud or deceit on the part of the Unions, the defense of unclean hands

cannot succeed.[93]

      To prevail on its defense of laches, the Authority must show that "(1)

the [Unions] knew of the [Authority's] misconduct; (2) the [Unions] inexcusably

delayed in taking action; (3) the defendant was prejudiced by the delay."[94]

Typically, prejudice ensues where the passage of time has resulted in

"unavailability of witnesses, changed personnel, and the loss of pertinent

records."[95]  In an appropriate case, however, a defendant may show it has been

prejudiced when it "has changed his position in a way that would not have

occurred if the plaintiff had not delayed."[96]

      The Authority argues that it has suffered prejudice as a result of the

Unions' long delay in bringing suit, having changed its position in negotiations in

--------

[93]    *See Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC,* 149 F.3d 85, 90
(2d Cir. 1998) (holding that the doctrine of unclean hands requires that plaintiffs
have acted in good faith, "fairly and without fraud or deceit").

[94]    *Ikelionwu v. United States,* 150 F.3d 233, 237 (2d Cir. 1998).

[95]    *E.E.O.C. v. Dresser Indus., Inc.,* 668 F.2d 1199, 1203 (11th Cir.
1982).

[96]    *Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 192 (2d Cir.
1996).

40

reliance on the Unions' failure to make a legal challenge to the Policy. Although the Authority has arguably suffered some prejudice as a result of the delay, the laches defense is unavailing, for the following reasons. *First,* the Authority has not met its burden of showing that the Unions' delay was inexcusable. The record shows that the Unions brought this suit promptly on learning of its possibility, following a decision from the Northern District of New York in *Fountain v. New York State of Correctional Services,* holding that the ADA prohibition is applicable to policies similar to those at issue here.[97] It appears that neither the Authority nor the Unions were aware of the illegality of the Policy before *Fountain.* The Unions' members should not be penalized for the understandable failure of their lawyers to anticipate this novel and imaginative application of the ADA.[98] *Second,* because the Unions brought this suit within the statute of limitations provided by the ADA, the Court may not apply laches to their claim.[99] "Separation of powers principles dictate that federal courts not apply laches to bar

---

[97]    190 F. Supp. 2d 355 (N.D.N.Y. 2002).

[98]    The *Conroy* court noted the novelty of the claim. *See Conroy,* 333 F.3d at 95 ("Our court has not previously interpreted this provision. Indeed, relatively few courts have addressed . . . this ADA prohibition."). The Court is not aware of *any* case prior to *Fountain* applying the ADA prohibition to a policy similar to the one at issue here.

[99]    The Unions' claim is timely because the Policy is a continuing violation of the ADA: the fact that the Policy has been in place for decades is irrelevant. *See Bazemore v. Friday,* 478 U.S. 385 (1986).

a federal statutory claim that is timely filed under an express federal statute of limitations."[100] *Third*, the Unions seek only to enjoin the Authority's future conduct. Laches is generally not applicable where a plaintiff seeks only to enjoin continuing future unlawful conduct.[101] Where there is a continuing violation, "even in equity . . . laches does not bar a claim for prospective injunctive relief."[102]

## IV. CONCLUSION

For the foregoing reasons, the Unions are entitled to a declaratory judgment to the following effect: the Policy's inquiries are within the scope of the ADA Prohibition, and the asserted business necessity of curbing sick leave abuse is adequate to justify the Policy as it stands only with respect to those employees who meet the criteria of the Authority's sick leave control list. However, the asserted business necessity of maintaining safety is sufficient to justify the Policy

---

[100] *Ivani Contracting Corp. v. City of New York,* 103 F.3d 257, 259 (2d Cir. 1997). *See also Ortiz v. Suffolk County Police Dep't,* 210 F. Supp. 2d 143, 146 (E.D.N.Y. 2002) ("It is a rare case where the doctrine of laches bars the prosecution of a federal claim that is timely filed under the applicable statute of limitations.").

[101] *See Southwest Voter Registration Educ. Project v. Shelley,* 344 F.3d 882, 906 (9th Cir. 2003) ("The general rule [is] that laches does not bar future injunctive relief . . . [A]lmost by definition, the plaintiff's past dilatoriness is unrelated to a defendant's ongoing behavior that threatens future harm.").

[102] *Lyons Partnership, L.P. v. Morris Costumes, Inc.,* 243 F.3d 789, 797 799 (4th Cir. 2001).

with respect to safety-sensitive employees, including bus operators. A further trial will be required to determine whether safety concerns may justify the Policy (as it stands) with respect to other groups of employees, or to all employees. Because it is not yet clear which groups may pose safety risks, the Policy may continue to be enforced until such time as that issue is determined.


SO ORDERED:


Shira A. Scheindlin
U.S.D.J.


Dated:    New York, New York
          October 12, 2004

- Appearances -

**For Plaintiffs:**

Walter M. Meginniss, Esq.
Margaret A. Malloy, Esq.
Gladstein, Reif & Meginniss, L.L.P.
817 Broadway, 6th Floor
New York, New York 10003
(212) 228-7727

**For Defendants:**

Richard Schoolman, Esq.
Baimusa Kamara, Esq.
Office of the General Counsel
New York City Transit Authority
130 Livingston Street
Brooklyn, New York 11201
(718) 694-4667